

**ORDERED in the Southern District of Florida on October 19, 2023.**



**Peter D. Russin, Judge**
**United States Bankruptcy Court**

---

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:

Marc D. Wolfson and
Mary Anne Wolfson

      Debtors.

_____/

Case No. 23-12564-PDR

Chapter 13

**FINDINGS OF FACT AND CONCLUSIONS OF LAW SUSTAINING, IN PART, ALL FLORIDA TREE & LANDSCAPE'S OBJECTION TO THE DEBTORS' CLAIM OF EXEMPTIONS, GRANTING ALL FLORIDA'S MOTION TO CONVERT CASE TO CHAPTER 7, AND DENYING ALL FLORIDA'S MOTION TO REOPEN THE EVIDENCE**

      Three months before the Debtors were set to go to trial in a state court lawsuit brought by their former employer, All Florida Tree & Landscape, Inc. ("All Florida"), they sold a cabin in North Carolina, netting nearly half a million dollars; used more than $260,000 of the proceeds to pay off the mortgage on their exempt homestead; and after routing the remainder through bank accounts in others' names, used nearly $100,000 to pay off credit card bills. Then, after a state court jury awarded All Florida

more than $460,000 in damages, the Debtors filed for chapter 13 bankruptcy just before the state court had an opportunity to enter the judgment. In their bankruptcy schedules, the Debtors failed to disclose (among other things) the sale of the North Carolina property; that ten days before filing for bankruptcy, they paid off a line of credit with a balance of more than $100,000, and that during the 90 days before this case was filed, they had made more than $25,000 in credit card payments.

All Florida has asked the Court to convert this case to chapter 7 "for cause" and sustain its objection to the Debtors' attempt to claim their homestead as exempt.[1] The evidence at trial established by a preponderance of the evidence that the Debtors converted the non-exempt proceeds from the sale of the North Carolina cabin into equity in their exempt homestead by paying off the existing mortgage with the intent to hinder, delay, or defraud All Florida. The evidence at trial also established that the Debtors' attempt to conceal the sale of the North Carolina cabin and the transfer of other assets disqualifies the Debtors from chapter 13. Accordingly, for the reasons stated below, the Court will (1) reduce the value of the Debtors' interest in their homestead by $267,478.91 under Bankruptcy Code § 522(o); and (2) convert this case to chapter 7.

## I.    Findings of Fact

The Debtors are Marc and Mary Anne Wolfson. After working as a paralegal for 25 years, Mrs. Wolfson went to work in the field as an arborist for All Florida Tree

---

[1] Docs. 57 & 76.

& Landscape, Inc. in 2017.[2] Part of that time, she worked for the company as a 1099 independent contractor through a company she formed, Arborist Services.[3] Mr. Wolfson served as an advisor to All Florida.[4] While advising All Florida, Mr. Wolfson created Vegetation Management, which, at some point, started handling All Florida's payroll.[5]

A.    The Wolfsons mortgaged their homestead property in Coral Springs in 2012.

Nearly thirty years ago, the Wolfsons bought real property located at 5855 NW 47th Place, Coral Springs, Florida (the "Homestead"),[6] where they have lived ever since.[7] The Wolfsons took out a $324,050 mortgage on their Coral Springs home in December 2012.[8]

B.    The Debtors held multiple bank accounts.

Over the years, the Debtors had a joint checking account at Bank of America[9] (the "BOA Joint Account") and four "retirement" accounts at UBS Financial Services:

---

[2] Doc. 133, p. 58, ll. 8 – 20.

[3] Doc. 133, p. 60, l. 20 – p. 61, l. 7; p. 64, ll. 21 – 24; All Florida Ex. 2, Doc. 134-2, p. 42, ll. 10 – 21.

[4] Doc. 133, p. 169, l. 25 – p. 170, l. 2; All Florida Ex. 2, Doc. 134-2,  p. 38, l. 25 – p. 39, l. 17.

[5] Doc. 133, p. 61, l. 11 – p. 62, l. 2.

[6] All Florida Ex. 3, Doc. 134-3.

[7] Doc. 125, ¶¶ 6 – 7.

[8] All Florida Ex. 4, Doc. 134-4.

[9] All Florida Ex. 120, Doc. 150-9, at Schedule A/B; All Florida Ex. 121, Doc. 150-10, at Schedule A/B; Doc. 133, p. 88, ll. 8 – 11.

Mrs. Wolfson's traditional IRA;[10] Mr. Wolfson's traditional IRA;[11] Mr. Wolfson's rollover IRA;[12] and a joint brokerage account (the "UBS Brokerage Account").[13] The UBS Brokerage Account was pledged as collateral for a line of credit from UBS (the "UBS Line of Credit"). Mrs. Wolfson also co-owned a UBS brokerage account with her father as joint tenants with a right of survivorship (the "Father's Joint UBS Account").[14]

The Wolfsons also controlled two bank accounts in the names of others: a Bank of America account in the name of Arborist Services, Inc. (the "BOA Arborist Account"),[15] the company Mrs. Wolfson used to provide services to All Florida, and a Bank of America account in the name of Dorothy Wolfson, as Trustee of the Dorothy Wolfson Revocable Living Trust DTD 12-21-94 (the "BOA Dorothy Trust Account").[16]

---

[10] All Florida Ex. 13, Doc. 137-1; All Florida Ex. 14, Doc. 138-1; All Florida Ex. 15, Doc. 139-1; All Florida Ex. 16, Doc. 140-1; All Florida Ex. 17, Doc. 140-2; All Florida Ex. 102, Doc. 153-3; All Florida Ex. 103, Doc. 153-4.

[11] All Florida Ex. 22, Doc. 142-1; All Florida Ex. 23, Doc. 143-1; All Florida Ex. 24, Docs. 144-1, 144-2, & 145-1; All Florida Ex. 25, Doc. 145-2; All Florida Ex. 26, Doc. 146-1; All Florida Ex. 107, Doc. 153-8; All Florida Ex. 108, Doc. 153-9.

[12] All Florida Exs. 18, Doc. 140-3; All Florida Ex. 19, Doc. 141-1; All Florida Ex. 20, Doc. 141-2; All Florida Ex. 21, Doc. 141-3; All Florida Ex. 104, Doc. 153-5; All Florida Ex. 105, Doc. 153-6; All Florida Ex. 106, Doc. 153-7.

[13] Doc. 133, p. 121, ll. 11 – 15; p. 157, ll. 14 – 22; All Florida Exs. 27, Doc. 146-2; All Florida Ex. 28, Docs. 147-1 & 147-2; All Florida Ex. 29, Doc. 148-1 & 148-2; All Florida Ex. 30 Doc. 149-1 & 149-2; All Florida Ex. 31, Doc. 150-1; All Florida Ex. 109, Doc. 153-10; All Florida Ex. 110, Doc. 153-11.

[14] Doc. 133, p. 110, p. 107, ll. 16 – 24; p. 112, ll. 9 – 12.

[15] Doc. 133, p. 94, l. 10 – p. 95, l. 8.

[16] Doc. 133, p. 59, ll. 22 – 24; p. 162, l. 25 – p. 163, l. 14.

Dorothy Wolfson, who  was Mr. Wolfson's mother, passed away in 2014.[17] After Dorothy passed away, the Wolfsons used the BOA Dorothy Trust Account as their own.[18]

C.    The Wolfsons bought a cabin in North Carolina.

In May 2018, the Wolfsons began looking to buy a cabin in North Carolina.[19] They wanted a place where their family could gather, and they thought they could rent out the cabin and cover the mortgage.[20] On June 28, 2018, the Wolfsons closed on the purchase of a cabin located at 1089 Asgi Trail, Maggie Valley, North Carolina 28751 for $625,000.[21] The Wolfsons put down a $125,000 down payment, with funds from their UBS Brokerage Account, and borrowed the remaining $500,000.[22]

D.    All Florida sued the Wolfsons.

Around the time the Wolfsons bought the North Carolina cabin, they had a falling out with All Florida. While the Wolfsons worked for All Florida, the business, which was owned by Alan McPherson, operated out of the Wolfsons' home.[23] According to the Wolfsons, one day they received a letter from a lawyer notifying them

---

[17] Doc. 133, p. 59, ll. 20 – 21.

[18] Doc. 133, p. 59, ll. 22 – 24; p. 162, l. 25 – p. 163, l. 14.

[19] All Florida Ex. 2, Doc. 134-2, p. 65, l. 21 – p. 66, l. 4.

[20] All Florida Ex. 2, Doc. 134-2,  p. 71, ll. 8 – 14.

[21] Doc. 125, ¶ 6; All Florida Ex. 77, Doc. 152-10.

[22] All Florida Ex. 2, Doc. 134-2, p. 63, l. 16 – p. 65, l. 6; p. 93, l. 25 – p. 94, l. 8.

[23] Doc. 133, p. 62, ll. 6 – 11.

that All Florida was moving its office from their home to West Palm Beach.[24] In the Wolfsons' telling, Mr. McPherson, a childhood friend of Mrs. Wolfson's brother, "pulled the rug out" from underneath them.[25] On June 15, 2018, ten days before the Wolfsons bought the North Carolina cabin, All Florida sued the Wolfsons in state court for tortious interference; civil theft; conversion; breach of contract; breach of fiduciary duty; an accounting; fraud; negligent misrepresentation; and civil conspiracy.[26]

      E.    <u>Before trial, the Wolfsons sold the cabin and paid off the mortgage on their Coral Springs homestead.</u>

For nearly three years, the Wolfsons and All Florida litigated their dispute in state court. On February 5, 2021, the state court scheduled the action for trial for August 2021.[27] Three months later, on May 14, 2021, three months before the state court action was scheduled to go to trial, the Wolfsons sold the North Carolina property for a little more than $1 million.[28] After satisfying the mortgage on the North Carolina property, the Wolfsons netted $456,459.23 from the sale.[29] Of that amount,

---

[24] All Florida Ex. 2, Doc. 134-2, p. 44, l. 24 – p. 45, l. 24.

[25] All Florida Ex. 2, Doc. 134-2, p. 38, ll. 3 – 22; p. 44, l. 13 – p. 45, l. 23; p. 57, ll. 14 – 17.

[26] All Florida Ex. 8, Doc. 135-1; All Florida Ex. 9, Doc. 136-1; All Florida Ex. 10, Doc. 136-2.

[27] All Florida Ex. 8, Doc. 135-1, at 13.

[28] Doc. 125, ¶ 8.

[29] Doc. 125, ¶ 9.

the Wolfsons had $267,478.91 wired directly from the closing to pay off the mortgage on the Homestead.[30]

> F.   <u>After routing the remaining proceeds through various bank accounts, the Wolfsons paid down nearly $100,000 in credit card debt and put $50,000 into their UBS Brokerage Account</u>.

Rather than have the remaining $188,980.32 wired to their BOA Joint Account, the Wolfsons had the funds wired to the Dorothy Trust Account.[31] Two weeks later, the Wolfsons wired $50,000 from the Dorothy Trust Account to their BOA Joint Account and $113,500 from the Dorothy Trust Account to the BOA Arborist Account.[32] The following day, the Wolfsons transferred the $50,000 from their BOA Joint Account to their UBS Brokerage Account.[33] The Wolfsons then used $95,000 from the BOA Arborist Account to pay off credit card bills.[34] By the end of June 2021, the Wolfsons had spent all the $113,500 that had been deposited into the BOA Arborist Account with those funds never having been in an account in their names.[35]

---

[30] Doc. 125, ¶ 11; All Florida Ex. 7, Doc. 134-7.

[31] All Florida Ex. 44, Doc. 150-14, p. 25.

[32] All Florida Ex. 44, Doc. 150-14, p. 25. After those transfers, $25,480.32 of the original $188,980.32 remained in the Dorothy Wolfson Trust account. Over the ensuing months, the Wolfsons transferred the remainder of those funds out of the account, mostly to the BOA Arborist Account. All Florida Ex. 44, Doc. 150-14.

[33] All Florida Ex. 39, Doc. 150-9, p. 27; All Florida Ex. 29, Doc. 148-2, p. 11.

[34] All Florida Ex. 34, Doc. 150-4, pp. 39 – 42.

[35] All Florida Ex. 34, Doc. 150-4, p. 39.

G.    After a jury awarded All Florida more than $460,000, the
      Wolfsons began paying creditors other than All Florida.

On September 9, 2022, a state court jury ruled against the Wolfsons on All Florida's claims and awarded All Florida $462,049.70 in damages.[36] The Wolfsons moved for a new trial, which the state court denied on January 10, 2023.[37]

In the week following the jury verdict, the Wolfsons transferred $50,350 from their UBS accounts ($42,850 from Mr. Wolfson's rollover IRA, which basically zeroed out that account, and $7,500 from their UBS Brokerage Account) to their BOA Joint Account.[38] That same day, the Wolfsons transferred $25,000 from their BOA Joint Account to the BOA Arborist Account.[39]

In the ten days following their motion for new trial being denied, $34,085.02 was transferred out of the Father's Joint UBS Account Mrs. Wolfson co-owned with her father, and $342,347.60 worth of securities in that account were liquidated, but where the funds landed is unknown.[40] During that same time, the Wolfsons transferred $15,000 from the BOA Joint Account to the BOA Arborist Account.[41] And within two months, in February and March 2023, the Wolfsons transferred another

[36] Doc. 125, ¶ 3; All Florida Ex. 10, Doc. 136-2.

[37] Doc. 125, ¶ 4; All Florida Ex. 11, Doc. 136-3.

[38] All Florida Ex. 40, Doc. 150-10, p. 41.

[39] All Florida Ex. 40, Doc. 150-10, p. 41.

[40] All Florida Ex. 117, Doc. 154-6, p. 3.

[41] All Florida Ex. 36, Doc. 150-6, p. 3.

$19,200 from their BOA Joint Account to the BOA Arborist Account.[42] On March 21, 2023, the Wolfsons wired $23,010.05 from their UBS Brokerage Account to their BOA Joint Account.[43] As of March 21, 2023, ten days before they filed bankruptcy, the Wolfsons' balance in their BOA Joint Account was $25,428.03.[44]

Between January and March 2023, the Wolfsons used the $34,085.02 they transferred into the BOA Arborist Account to pay $25,648.33 in credit card bills ($7,100 to Bank of America; $9,000 to Capital One; $7,376 to Chase; $1,550 on a Marriott Rewards card; and $622.33 to American Express).[45] On March 21, 2023, the Wolfsons liquidated stock in their UBS Brokerage Account and paid off their $105,239.57 UBS Line of Credit, leaving the UBS Brokerage Account with a $38.78 balance.[46]

Ten days later, the Wolfsons filed for chapter 13 bankruptcy after having—since the jury trial was first set—sold the North Carolina Property and used the net proceeds of $456,459.23 to pay off the mortgage on their homestead in the amount of $267,478.91, and credit card debts of over $120,000. They also liquidated stock and paid off the UBS Line of Credit in part from $50,000 circuitously deposited in the UBS Brokerage Account from the closing proceeds. Other than the homestead and

---

[42] All Florida Ex. 36, Doc. 150-6, pp. 8 & 16.

[43] All Florida Ex. 41, Doc. 150-11, p. 10.

[44] All Florida Ex. 41, Doc. 150-11, p. 8.

[45] All Florida Ex. 36, Doc. 150-6, pp. 3 – 17.

[46] All Florida Ex. 31, Doc. 150-1, p. 47.

IRA's, their schedules disclosed assets of $10,751 and liabilities of $200,350 for credit cards and their lawyers in the All Florida litigation and to All Florida in what they claim is an unknown amount, but which the jury found to be $462,049.70.

    H.    <u>The Wolfsons failed to disclose assets and payments on their bankruptcy schedules</u>.

The Wolfsons scheduled approximately $1.1 million in assets, including their Homestead ($690,000); an unspecified IRA ($400,000); their BOA Joint Account ($1,541); the BOA Dorothy Trust Account ($950); and the BOA Arborist Account ($4,140).[47] They claimed their Homestead and the IRA as exempt.[48] They did not schedule their UBS Brokerage Account or Mrs. Wolfson's interest in the Father's Joint UBS Account.

Although the Statement of Financial Affairs requires debtors to disclose each creditor to whom the debtor paid $600 or more during the 90 days before the petition date (Part 3, Question 6), as well as any transfers of property (other than property transferred in the ordinary course of business) within two years before the petition date (Part 7, Question 18), the Wolfsons failed to disclose:

- The May 14, 2021 sale of the North Carolina cabin, which netted the Wolfsons $456,459.23 within two years of the petition date;

- Payment of $25,648.33 to credit card companies during the three months before the petition date; or

- Payment of $105,239.57 on the line of credit with UBS ten days before the petition date.

---

[47] All Florida Ex. 120, Doc. 154-8, Schedule A/B.

[48] All Florida Ex. 120, Doc. 154-8, Schedule C.

On April 26, 2023, the Wolfsons amended their schedules to increase the balance of their joint checking account from $1,541 to $14,621.[49] The amended schedules, however, still omitted the Wolfsons' UBS Brokerage Account and Mrs. Wolfson's interest in the Father's Joint UBS Account.[50] And there was still no explanation for how the balance on the Wolfsons' BOA Joint Account went from $25,428.03 on March 21 to $1,541 ten days later when the Wolfsons filed their petition or to $14,621 when they filed their amended schedules. The Wolfsons did not amend the Statement of Financial Affairs to disclose the sale of the North Carolina cabin until after the Chapter 13 Trustee inquired about it during the §341 meeting.

I.    <u>The Wolfsons made false statements during their § 341 meeting testimony</u>.

On May 19, 2023, the Wolfsons appeared before the Chapter 13 Trustee for their § 341 meeting.[51] At the outset, the Wolfsons testified that they disclosed all their assets and no changes needed to be made to their schedules.[52] When asked when they last made a mortgage payment, Mr. Wolfson responded "several months ago," even though the mortgage had been paid off two years earlier, before Mrs. Wolfson corrected him and responded that they owned their home and there was no mortgage

---

[49] All Florida Ex. 121, Doc. 154-9, Schedule A/B.

[50] All Florida Ex. 121, Doc. 154-9, Schedule A/B.

[51] All Florida Ex. 1, Doc. 134-1.

[52] All Florida Ex. 1, Doc. 134-1, p. 6, ll. 12 – 23.

on it.[53] When asked when they last made a credit card payment, Mr. Wolfson answered "many months ago."[54]

The Trustee also asked about the sale of the North Carolina property, which he had discovered from the Wolfsons' 2021 tax return.[55] The Trustee asked the Wolfsons to confirm they had netted over $400,000 from the sale. After initially responding that whatever was on their tax return was accurate, Mr. Wolfson testified they walked away from the sale with $50,000.[56] All Florida's counsel asked whether the All Florida litigation was still pending when the Wolfsons sold the North Carolina cabin and paid off the mortgage on their homestead. Mr. Wolfson answered "no."[57]

J.    The Wolfsons disclosed the sale of the North Carolina cabin on their amended Statement of Financial affairs but not the other transfers.

Two days after the § 341 meeting of creditors, the Wolfsons amended their Statement of Financial Affairs.[58] They disclosed for the first time the sale of the North Carolina cabin.[59] But they still omitted the $25,648.33 they paid to credit card companies and the $105,239.57 they paid to UBS on their line of credit.[60]

---

[53] All Florida Ex. 1, Doc. 134-1, p. 8, l. 21 – p. 9, l. 3.

[54] All Florida Ex. 1, Doc. 134-1, p. 10, ll. 18 – 20.

[55] All Florida Ex. 1, Doc. 134-1, p. 9, l-. 4 – 7.

[56] All Florida Ex. 1, Doc. 134-1, p. 9, ll. 4 – 15; p. 11, l. 24 – p. 13, l. 7.

[57] All Florida Ex. 1, Doc. 134-1, p. 13, ll. 18 – 24.

[58] All Florida Ex. 122, Doc. 154-10.

[59] All Florida Ex. 122, Doc. 154-10, p. 5.

[60] All Florida Ex. 122, Doc. 154-10.

K.    <u>The Wolfsons failed to provide Rule 2004 discovery</u>.

On June 5, 2023, All Florida scheduled the Wolfsons for a Rule 2004 examination for ten days later and requested that the Wolfsons produce (among other things) any records pertaining to any real property they had sold and any account statements for bank accounts or brokerage accounts during the four years before the petition date.[61] During the Rule 2004 examination, it became clear the Wolfsons had not produced all documents responsive to All Florida's Rule 2004 request.[62]

The Wolfsons testified that they had one brokerage account with two IRAs (rather than the one listed on their schedules) but that they did not produce those account statements because their old printer had broken and their new one had not been set up.[63] And while they had produced a couple of months of bank statements for the BOA Arborist Account, they had not produced four years' worth of bank statements because they were supposedly unaware of the timeframe requested.[64] All Florida suspended the Wolfsons' Rule 2004 exam until it received the rest of the documents it requested, including:

- Four years of bank statements for any personal accounts and the BOA Dorothy Trust Account;

- Four years of statements for their IRAs;

---

[61] Doc. 27, Ex. A.

[62] All Florida Ex. 2, Doc. 134-2, p. 5, l. 19 – p. 16, l. 14.

[63] All Florida Ex. 2, Doc. 134-2, p. 16, ll. 1 – 17.

[64] All Florida Ex. 2, Doc. 134-2, p. 9, l. 6 – p. 16.

- Documents evidencing which account the sales proceeds from the North Carolina cabin were deposited into; and

- Documents evidencing what happened to those sales proceeds.[65]

L. <u>All Florida objected to the Wolfsons' exemptions and sought to convert this case to chapter 7</u>.

On July 9, 2023, All Florida objected to the Wolfsons' claim that the Homestead and their IRAs are exempt.[66] According to All Florida, the value of the Wolfsons' Homestead exemption should be reduced under Bankruptcy Code § 522(o) by $267,478.91—the amount All Florida says the Wolfsons fraudulently converted from the non-exempt proceeds of the sale of the North Carolina cabin into exempt equity in their Homestead by paying off the Homestead mortgage.[67] All Florida contended the IRAs were not exempt because there was no way to tell whether non-exempt property was fraudulently converted into the IRAs.[68] In August 2023, All Florida moved to convert this case from chapter 13 to chapter 7 because they contended the Wolfsons had not timely provided Rule 2004 discovery and had not filed this case in good faith.[69]

---

[65] All Florida Ex. 2, Doc. 134-2, p. 125, ll. 19 – 24.

[66] Doc. 57.

[67] Doc. 57, ¶¶ 16 – 28.

[68] Doc. 57, ¶¶ 29 – 33.

[69] Doc. 76.

M.    All Florida sought to hold the Wolfsons in contempt for failing to produce Rule 2004 discovery.

Following the Rule 2004 exam, the Wolfsons produced their 2019 and 2020 tax returns; Arborist Services' 2020 tax return; Arborist Services' bank statements for January through April 2020 and January 2021 through December 2021; and certain bank statements for the BOA Dorothy Trust Account.[70] But the Wolfsons still had failed to produce (among other things) bank statements for the Wolfsons' BOA Joint Account for March 2019 through December 2022; certain statements for the BOA Dorothy Trust Account; and credit card statements for the four years before the petition date.[71]

The Wolfsons agreed to an order that required them to produce all outstanding documents by August 17, 2023.[72] After the deadline, All Florida's counsel received a box of documents from the Wolfsons with account statements from four UBS accounts.[73] It was at that point that All Florida learned for the first time that the Wolfsons had five accounts and two lines of credit with UBS.[74] And the Wolfsons still had not produced their bank statements for their BOA Joint Account for February 16, 2023 through March 31, 2023,[75] which would have reflected how the balance for

---

[70] Doc. 73, ¶ 12.

[71] Doc. 73, ¶ 13.

[72] Doc. 78, ¶ 2.

[73] Doc. 105, ¶¶ 3 – 6.

[74] Doc. 105, ¶¶ 3 – 6 & Ex. A.

[75] Doc. 105, ¶ 12.

that account decreased from $25,428.03 ten days before the petition date to $1,541 (according to the Wolfsons' initial schedules) or $14,621 (according to the Wolfsons' amended schedules) on the petition date. In the meantime, All Florida subpoenaed documents from Bank of America, UBS, and others.[76]

      N.      <u>At trial, the Wolfsons attempted to explain the sale of the North Carolina cabin and their omissions on their schedules.</u>

The Court consolidated for trial All Florida's objection to the Wolfsons' exemptions and its motion to convert.[77] At trial, the Wolfsons relied on their Rule 2004 testimony to try to convince the Court they sold the North Carolina cabin because their family did not want to use it anymore, and they simply took advantage of the chance to sell it because "the market went through the roof."[78] Mr. Wolfson testified at trial that they routed the sales proceeds through the BOA Dorothy Trust Account "[a]s a convenience."[79] When asked to elaborate on how that was "convenient," Mr. Wolfson testified he would sometimes hold money in that account until he figured out where it should go:

> Sometimes there was large amounts of money that was earned, and yet we had to distribute funds to other people, or determine what went into the business and what went into personal accounts. So before we did that, we simply lump-summed it and put it into the Dorothy Wolfson Trust, and then later distributed it to the proper parties.[80]

---

[76] Doc. 88.

[77] Docs. 68 & 77.

[78] All Florida Ex. 2, Doc. 134-2, p. 71, l. 8 – p. 72, l. 3; Doc. 131, ¶ 6.

[79] Doc. 133, p. 165, l. 18 – p. 166, l. 6.

[80] Doc. 133, p. 169, ll. 4 – 15.

As for why they did not disclose the sale on their Statement of Financial Affairs, Mrs. Wolfson testified that a questionnaire from the Chapter 13 Trustee asked whether they had sold, transferred, or given away anything worth more than a thousand dollars during the year before the petition date.[81] Although the Wolfsons did not testify to it, their lawyer implied, during argument, that the one-year time period in the Chapter 13 questionnaire caused the Wolfsons to misunderstand the two-year time period in the Statement of Financial Affairs. As for the rest of the omissions, the Wolfsons testified they did their best in filling out their schedules.[82]

   O.   <u>All Florida sought to reopen the evidence.</u>

At the conclusion of trial, the Court took the matter under advisement. The Wolfsons and All Florida both submitted post-trial written closing arguments.[83] Before the Court had a chance to rule, All Florida moved to reopen the evidence.

All Florida alleges in its motion that after trial, it received a copy of a statement for March 22, 2023 to April 18, 2023 for the Wolfsons' BOA Joint Account.[84] That statement, which the Wolfsons had not produced in Rule 2004 discovery, shows that the Wolfsons withdrew $24,000 in cash four days before filing for bankruptcy.[85]

---

[81] Doc. 133, p. 140, l. 25 – p. 143, l. 12.

[82] Doc. 133, p. 144, l. 4 – p. 145, l. 11.

[83] Docs. 131 & 132.

[84] Doc. 155, ¶ 1.

[85] Doc. 155, ¶ 2 & Ex. 1.

## II.    Jurisdiction

The Court's subject matter jurisdiction is derived from 28 U.S.C. § 1334. The Court has statutory authority to hear and determine this proceeding under 28 U.S.C. § 157(a) & (b)(2)(A) and (B), and the general order of reference from the United States District Court for the Southern District of Florida. The Court has constitutional authority to enter final orders in this core proceeding. Venue is proper under 28 U.S.C. § 1408.

## III.    Conclusions of Law

The evidence at trial established by a preponderance of the evidence that the Wolfsons converted the non-exempt proceeds from the sale of the North Carolina cabin into their Homestead by paying off an existing mortgage with the intent to hinder, delay, or defraud All Florida. The evidence at trial also established that the Wolfsons' attempt to conceal the transfer of the North Carolina cabin and other assets disqualifies the Wolfsons from being chapter 13 debtors. Accordingly, for the reasons stated below, the Court will (1) reduce the value of the Wolfsons' interest in the Homestead by $267,478.91 under Bankruptcy Code § 522(o); and (2) convert this case to chapter 7.

A.    <u>The Wolfsons' homestead exemption should be reduced by $267,478.91 under Bankruptcy Code § 522(o).</u>

The Florida Constitution affords broad homestead protection to Florida residents.[86] Indeed, the protection is so broad that, as the Florida Supreme Court

---

[86] Art. X, § 4(a)(1), Fla. Const.

pointed out two decades ago in *Havoco of America, Ltd. v. Hill*, a judgement debtor's homestead is protected—outside bankruptcy—even if the judgment debtor fraudulently transfers non-exempt funds into their homestead to avoid creditors, provided the non-exempt funds were not "obtained through fraud or egregious conduct."[87] When Congress passed the Bankruptcy Abuse Prevention and Consumer Act of 2005 ("BAPCPA"), however, it preempted decisions like *Havoco* by adding Bankruptcy Code § 522(o).[88]

Bankruptcy Code § 522(o) provides that the value of a debtor's interest in homestead property "shall be reduced to the extent that such value is attributable to any portion of any property that the debtor disposed of in the 10-year period ending on the date of the filing of the petition with the intent to hinder, delay, or defraud a

---

[87] *Havoco of Am., Ltd. v. Hill*, 790 So. 2d 1018, 1028 (Fla. 2001) ("The transfer of nonexempt assets into an exempt homestead with the intent to hinder, delay, or defraud creditors is not one of the three exceptions to the homestead exemption provided in article X, section 4. Nor can we reasonably extend our equitable lien jurisprudence to except such conduct from the exemption's protection. We have invoked equitable principles to reach beyond the literal language of the exceptions only where funds obtained through fraud or egregious conduct were used to invest in, purchase, or improve the homestead."); *In re Hampton*, 616 B.R. 917, 923 n.52 (Bankr. S.D. Fla. 2020) ("Indeed, the Florida Supreme Court has held that a homestead acquired by a debtor with the specific intent to hinder, delay, or defraud creditors is still exempt under Article X, Section 4 of the Florida Constitution.") (citing *Havoco*, 790 So. 2d 1030).

[88] 11 U.S.C. § 522(o); *In re Roberts*, 527 B.R. 461, 472 – 73 (Bankr. N.D. Fla. 2015) ("Congress' enactment of Section 522(o) was prompted in large part by Florida's 'virtually limitless' homestead law. 'Sections 522(o) and 522(p) limit a debtor's homestead exemption in bankruptcy, notwithstanding that the same exemption would be unlimited under state law had the debtor not filed bankruptcy.' By virtue of the Supremacy Clause of the United States Constitution, Section 522(o) preempts Florida's constitutional homestead exemption.") (quoting *In re Cook*, 535 B.R. 877, 883 – 84 (Bankr. N.D. Fla. 2013) (citations omitted)); *In re Garcia*, 2010 WL 2697020, at *3 (Bankr. S.D. Fla. July 6, 2010) ("It is also undisputed that the virtually limitless Florida homestead law prompted the enactment of section 522(o). Moreover, the provisions of the Florida Constitution conflict with section 522(o). Accordingly, by virtue of the Supremacy Clause, 11 U.S.C. § 522(o) preempts Florida's constitutional homestead exemption.").

creditor and that the debtor could not exempt."[89] Put another way, "§ 522(o)(4) requires the Debtors' homestead exemption to be reduced to the extent that Debtors converted non-exempt assets into the claimed homestead within ten (10) years before the bankruptcy filing, if the transfer was done with the intent to hinder, delay, or defraud a creditor."[90]

Here, the Wolfsons do not dispute that the proceeds from the sale of the North Carolina property were non-exempt or that they were converted into the Wolfsons' Homestead within ten years before this case was filed. The sole dispute is whether they did so with the intent to hinder, delay, or defraud All Florida. A party objecting to a debtor's homestead exemption under § 522(o) has the burden of proving by a preponderance of the evidence that the debtor converted non-exempt assets into their homestead with the intent to hinder, delay, or defraud their creditors.[91]

Congress did not define the phrase "intent to hinder, delay, or defraud a creditor" in § 522(o).[92] Courts considering whether a debtor converted non-exempt assets into a homestead with such intent have looked to the traditional "badges of

---

[89] 11 U.S.C. § 522(o)(4).

[90] *Roberts*, 527 B.R. at 473.

[91] Fed. R. Bankr. P. 4003 ("In any hearing under this rule, the objecting party has the burden of proving that the exemptions are not properly claimed."); *Roberts*, 527 B.R. at 473 ("As the objecting party, the Trustee has the burden of proving by a preponderance of the evidence that the Debtors intended to defraud their creditors when they transferred non-exempt assets into their current homestead.").

[92] *Roberts*, 527 B.R. at 473.

fraud."[93] Those "badges of fraud" include whether the transfer was not disclosed or was concealed; the debtor had been sued or threatened with suit before the transfer was made; the debtor removed or concealed assets; and the transfer occurred shortly before or shortly after a substantial debt was incurred.[94]

Here, all the relevant "badges of fraud" weigh in favor of finding that the Wolfsons intended to hinder, delay, or defraud All Florida. At the time they transferred the sales proceeds from the North Carolina cabin into their homestead, All Florida's suit against the Wolfsons was pending. The Wolfsons converted the non-exempt sales proceeds into their homestead knowing the suit was set to go to trial in a few months. And the Wolfsons attempted to conceal the transfer by having the proceeds to pay off their mortgage wired directly from the closing agent to their mortgage company; routing the remaining proceeds through the BOA Dorothy Trust Account and BOA Arborist Account; and failing to list the transfer on their Statement of Financial Affairs.

The Wolfsons have attempted to offer an innocent explanation for their failure to disclose the transfer on their Statement of Financial Affairs. They imply the Chapter 13 Trustee's questionnaire confused them into thinking they only had to disclose transfers made within the previous one year (instead of the previous two years). That explanation is not credible. What does a question on the Chapter 13

---

[93] *In re Booth*, 417 B.R. 820, 823 (Bankr. M.D. Fla. 2009) ("The 'badges of fraud' approach is used in analyzing a debtor's intent in a Section 548(a)(1)(A) or Section 727(a)(2) proceeding and has been routinely employed in Section 522(o) determinations.").

[94] *Roberts*, 527 B.R. at 473 – 74 (citing *In re XYZ Options, Inc.*, 154 F.3d 1262, 1272 (11th Cir. 1998)).

Trustee's questionnaire have to do with a completely different question on a completely different document, which is plain and easily understood?

To find there was no fraudulent intent, the Court must accept that the timing of the sale of the cabin (just months before the state court action was to go to trial) was a coincidence; the Wolfsons inadvertently failed to disclose the transfer of the North Carolina cabin on their Statement of Financial Affairs because they were confused by a question in a separate document; Mr. Wolfson mistakenly testified that the Wolfsons had made a mortgage payment "several months ago," even though the mortgage had been paid off for two years by that point; and based on a misunderstanding of the word "netted," the Wolfsons inadvertently testified that they only netted $50,000 from the sale of the North Carolina cabin when they netted more than $450,000. Putting aside that the foregoing comedy of errors is highly unlikely, the Court cannot help but notice that all the "inadvertent mistakes" cut one way: in favor of concealing the conversion of the non-exempt proceeds into the Wolfsons' Homestead.

This is not a close case. The evidence is overwhelming that the Wolfsons converted $267,478.91 in non-exempt proceeds from the sale of the North Carolina cabin into their Homestead with the intent to hinder delay and defraud All Florida. Therefore, Bankruptcy Code § 522(o) mandates that the Court reduce the value of the Wolfsons' interest in their Homestead by $267,478.91.

B.    <u>The Wolfsons' three IRAs are exempt, but the joint UBS brokerage accounts are not</u>.

On Schedule C, the Wolfsons claimed an IRA worth $400,000 as exempt under section 222.21(2), Florida Statutes. As it turns out, it is undisputed based on the evidence at trial that the Wolfsons had three IRAs at UBS: Mrs. Wolfson's traditional IRA, Mr. Wolfson's traditional IRA, and Mr. Wolfson's rollover IRA. In its post-trial closing argument, All Florida concedes the Wolfsons' traditional IRAs are exempt, and it appears All Florida does not dispute that Mr. Wolfson's rollover IRA is exempt too.[95] Thus, the Court concludes that the Wolfsons' three IRAs are exempt.

There was evidence at trial, however, that proved that Mr. Wolfson transferred $42,850 from his rollover IRA to the Wolfsons' BOA Joint Account four days after the jury ruled against the Wolfsons. He also transferred $35,000 from his traditional IRA to the Wolfsons' BOA Joint Account three months before the Wolfsons filed for bankruptcy. All Florida claims those funds lost their exempt status.

To the extent money was withdrawn from one of Mr. Wolfson's IRAs, deposited into the Wolfsons' BOA Joint Account, and remained there as of the petition date, those funds may have lost their exempt status. But neither party presented any evidence that any of the $77,850 remained there as of the petition date. In fact, the evidence shows that three months after Mr. Wolfson transferred $42,850 from his rollover IRA to the BOA Joint Checking Account, the balance in the BOA Joint

---

[95] Doc. 132 at 17 – 18.

Account was down to $1,416.02.[96] As of March 21, 2023, two months after the $35,000 transfer from Mr. Wolfson's traditional IRA to the BOA Joint Account, the balance was $25,428.03—but that was only after a $23,010.05 deposit from the UBS Brokerage Account that same day.

Based on the evidence in the record, the Court cannot conclude that any of the funds transferred from one of Mr. Wolfson's IRAs remained in the BOA Joint Account. To the extent exempt funds were deposited and then spent, they may not be exempt— but they are gone. Therefore, to the extent that All Florida objects to the exempt status of the $77,850 withdrawn from Mr. Wolfson's IRAs, the Wolfsons have not claimed those funds as exempt, and there is simply no evidence with respect to the final location of those funds as of the petition date. In short, there does not seem to be a controversy over this issue.

All Florida also objects that the Wolfsons' joint UBS brokerage account and the Father's Joint UBS Account Mrs. Wolfson co-owned with her father were not IRAs and therefore are not exempt. It is not clear that the Wolfsons were claiming the UBS Brokerage Account or the Father's Joint UBS Account as exempt. In any event, there was no evidence at trial that either joint brokerage account at UBS were IRAs. Therefore, neither the UBS Brokerage Account nor the Father's Joint UBS Account are exempt.

---

[96] All Florida Ex. 40, Doc. 150-10.

C.    <u>This case should be converted to chapter 7 for cause</u>.

Bankruptcy Code § 1307 authorizes this Court to dismiss a chapter 13 case or convert it to chapter 7 "for cause."[97] Section 1307 provides a non-exhaustive list of grounds for "cause."[98] Although none of the grounds mention "bad faith," bankruptcy courts "routinely treat dismissal for prepetition bad faith conduct as implicitly authorized by the words 'for cause.'"[99]

1.    <u>"Cause" exists to dismiss or convert this case</u>.

As the United States Supreme Court explained sixteen years ago, in *Marrama v. Citizens Bank of Massachusetts*, "[a]n issue that has arisen with disturbing frequency is whether a debtor who acts in bad faith prior to, or in the course of, filing a Chapter 13 petition by, for example, fraudulently concealing significant assets, thereby forfeits his right to obtain Chapter 13 relief."[100] The *Marrama* Court explained, "federal courts are virtually unanimous that prepetition bad-faith conduct may cause a forfeiture of any right to proceed with a Chapter 13 case."[101]

This case arises out of a business dispute with All Florida. The Wolfsons filed for bankruptcy after a jury ruled against them but before a final judgment could be

---

[97] 11 U.S.C. § 1307(c).

[98] 11 U.S.C. § 1307(c)(1) – (11).

[99] *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 373 (2007).

[100] *Id.* at 367.

[101] *Id.*

entered. And most important, the Wolfsons engaged in pre-bankruptcy planning with the intent to hinder delay and defraud All Florida.

The Wolfsons sold their North Carolina cabin and converted $267,478.91 of the $456,459.23 non-exempt proceeds into their Homestead. They routed the remaining $188,980.32 through two bank accounts in the names of others before putting $50,000 into their UBS Brokerage Account and paying off nearly $100,000 in credit card debt. Then, within ten days of the state court denying the Wolfsons' motion for new trial, $34,085.02 was transferred out of the UBS brokerage account Mrs. Wolfson co-owned with her father, and $342,347.60 worth of securities in that account were liquidated. And within the 90 days before bankruptcy, the Wolfsons paid $25,648.33 in credit card bills and a $105,239.57 line of credit with UBS.

When the Wolfsons filed for bankruptcy, they failed to disclose the sale of the North Carolina cabin, their UBS Brokerage Account, the Father's Joint UBS Account, the $25,648.33 in credit card payments, or the payoff of the $105,239.57 UBS Line of Credit. They compounded the problem by lying in their § 341 meeting that they had disclosed all their assets and that they had netted only $50,000 from the sale of the North Carolina cabin.

There is no innocent explanation for this conduct. As discussed above, the Wolfsons' explanation for why they failed to disclose the sale of the North Carolina cabin on their Statement of Financial Affairs is simply not credible. Nor is their explanation for why they used the BOA Dorothy Trust Account instead of the account they had in their own name. Was it convenient or did the Wolfsons intend to route

26

money through the BOA Dorothy Trust Account (and the BOA Arborist Account) to keep the non-exempt funds out of the Wolfsons' name and potentially beyond the prying eyes of a known creditor? Since there is no discernable convenience to routing the money in this way, and because the Wolfson's also failed to disclose the sale of the North Carolina Property, the answer is sadly clear. Counsel for the Wolfson's argued that they did what anyone else would have done. While there is no empirical evidence to support this assertion, it is beside the point. The Bankruptcy Code seeks to reward the honest but unfortunate debtor with the opportunity to discharge their debts and start fresh. To tolerate the dishonest debtor because others similarly situated may have pursued a similar path would render that goal meaningless.

"[A] ruling that an individual's Chapter 13 case should be dismissed or converted to Chapter 7 because of prepetition bad-faith conduct . . . is tantamount to a ruling that the individual does not qualify as a debtor under Chapter 13. That individual, in other words, is not a member of the class of 'honest but unfortunate debtor[s]' that the bankruptcy laws were enacted to protect."[102] Based on their prepetition conduct and their conduct in this case, the Wolfsons do not qualify as "honest but unfortunate" debtors who are eligible for chapter 13.

2.    Conversion is in the best interests of creditors.

"The decision to dismiss or convert a chapter 13 case under § 1307(c) is within the discretion of the bankruptcy court."[103] In exercising that discretion, this Court

---

[102] *Id.* 373 – 74,

[103] *In re Buis*, 337 B.R. 243, 253 (Bankr. N.D. Fla. 2006).

must be guided by the "best interests of the creditors and the estate."[104] Both the best

interests of the creditors and the estate warrant converting this case to chapter 7.

All Florida, the largest creditor in this case, favors conversion. Outside

bankruptcy, the Wolfsons have been able to fraudulently conceal and convert assets.

In a chapter 7 case, a trustee is imbued with the statutory authority to investigate

the Wolfsons' financial affairs and to pursue potential causes of action for the benefit

of all creditors, including All Florida. Therefore, the Court will convert this case to

chapter 7.

     D.    <u>The Court need not reopen the evidence in this case</u>.

All Florida has asked the Court to reopen the evidence in this case so the Court

can consider a bank statement showing that the Wolfsons withdrew $24,000 in cash

from their joint checking account four days before filing for bankruptcy.[105] According

to All Florida, this Court has discretion to reopen the evidence if (1) the additional

evidence is material; (2) the Wolfsons had an opportunity for cross-examination; and

(3) Wolfsons will suffer no prejudice.[106]

At this point, the Court is not persuaded that the evidence is material. To be

sure, evidence that the Wolfsons withdrew $24,000 from their joint checking account

four days before filing for bankruptcy and failed to disclose it is relevant to dismissal

or conversion for "cause." But the record is replete with the Wolfsons concealing

---

[104] 11 U.S.C. § 1307(c).

[105] Doc. 155, ¶ 2 & Ex. 1.

[106] Doc. 155, ¶ 6. (citing *Dunson v. Stabilis Fund II, LLC (In re Dunson)*, 2014 WL 7793689 (Bankr. N.D. Ga. Sept. 16, 2014)).

assets. On the record before it, the Court is convinced that conversion for "cause" is warranted. This newly discovered evidence is therefore cumulative. For that reason, the Court will deny All Florida's request to reopen the evidence without prejudice.

## IV.    Conclusion

By separate order, this Court will (1) sustain All Florida's objection to the Wolfsons' homestead exemption and reduce the value of the Wolfsons' interest in the Homestead by $267,478.91 under Bankruptcy Code § 522(o); (2) overrule All Florida's objection to the Wolfsons' claim that their IRAs are exempt; will neither sustain or overrule All Florida's objection that the $77,850 Mr. Wolfson transferred from his IRAs to the BOA Joint Account is exempt as a nonissue; and sustain All Florida's objection to the extent the Wolfsons claimed the UBS Brokerage Account or the Father's Joint UBS Account exempt;  and (3) convert this case to chapter 7.

###

Copies to:

All parties in interest.